William Harrington, Alfred Harrington and Charles Beecher, trading as Harrington Bros., *v.* Florence Oil Company, Appellant.

*Equity—Jurisdiction—Practice.*

A bill in equity will not be dismissed for want of jurisdiction after reference to a master, the taking of a large amount of testimony, and the incurring of heavy costs, although the controversy concerns merely an alleged breach of contract and a claim for unliquidated damages.

*Equity—Account render—Jurisdiction.*

Where an action of account render will lie in Pennsylvania between tenants in common, a court of equity has concurrent jurisdiction.

Plaintiffs and defendant were tenants in common of an oil lease. The defendant kept all the accounts pertaining to the lease, made all purchases, paid bills, and furnished plaintiffs statements from time to time, deducting plaintiffs' proportion of the expenses. *Held,* that plaintiffs might maintain a bill in equity for an account against defendant.

*Tenants in common—Negligence—Oil well.*

Plaintiffs and defendant were tenants in common of an oil lease; plaintiffs owning one sixth and defendant five sixths in the lease. Plaintiffs drilled a well under contract with defendant, and by reason of defendant's delay in furnishing casing the well was destroyed by the falling in of the sides. *Held,* that the plaintiffs and the defendant should bear the loss of the well in proportion to their respective interests.

Argued Oct. 29, 1896. Appeal, No. 74, Oct. T., 1896, by defendant, from decree of C. P. No. 3, Allegheny Co., Aug. T., 1896, No. 449, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for an account.

The case was referred to John G. MacConnell, Esq., who reported as follows:

On February 25, 1892, the firm of Friday, Keil & Company and Harrington Brothers entered into the following contract, the same having been printed and signed, as follows, on behalf of the plaintiffs, "Friday, Keil & Co.," and on behalf of the defendant, "Harrington Brothers."

"This memorandum, made the 25th day of February, A. D.

1892, between Friday, Keil & Company, of Pittsburg, Pennsylvania, as parties of the first part, and Harrington Bros., of Washington, Pa., as parties of the second part, witnesseth :

" That whereas, The parties of the first part are the owners of a certain lease for oil and gas purposes, made February 19, 1892, by James R. Kelso, guardian of Arthur Robb, et al., to C. B. Shaffer and J. T. Keil, of a certain tract of land situate in South Fayette township, Allegheny county, bounded on the north by lands of F. Mankedick ; on the east by lands of Benjamin Kelso ; on the south by lands of Mrs. Campbell, and on the west by lands of James McEwen, containing seventy-six and one half acres, subject to certain rents or royalties, and upon terms and conditions in said lease set forth. And whereas, The parties of the second part are willing to drill and complete a well on said premises for an interest in said lease.

" Now it is agreed as follows, to wit:

" 1. The parties of the second part agree that they will commence forthwith and at their own cost and expense proceed continuously with diligence and without delay, to erect a derrick and drill, finish and complete a well, in good producing order and condition, in manner as wells are usually completed in good producing condition in that vicinity. In case the well so to be drilled shall be a producing well, the parties of the second part shall also, at their cost and expense, furnish and set up such tankage as may be needed for the successful operation of said well.

" 2. Upon the said well being completed and put in good producing order and condition as before provided, the parties of the first part agree to transfer, set over and assign unto the parties of the second part, an undivided one-sixth of the lessee's interest in the said lease, under and subject to the terms and conditions thereof. It is understood that tubing and sucker rods necessary to pump said well, the cost of same shall be borne by the parties in interest in proportion to their respective holdings.

" 3. If the well so to be drilled be a paying well, the derrick, engine, boiler, casing, tubing, tankage, and everything used in and about the operation of said well shall belong to the parties hereto as if part of the said leasehold ; that is to say, the parties of the first part shall have a five-sixth interest therein, and the

parties of the second part shall have a one-sixth interest therein; but if the said well be not a paying well, the property above mentioned and used in and about the completion of said well, shall belong to the parties of the second part.

"4. If any controversy arises in relation to the drilling through the coal on said premises, the parties of the second part shall not be required to pay any part of the expenses incurred in the settlement thereof.

"5. After the completion of the first well all expenses incurred in developing or operating upon said premises by the parties hereto, shall be borne by them in proportion to their respective interests, and the parties of the second part are to have the first opportunity of taking contracts for drilling wells, provided they will contract on as reasonable terms as other reliable contractors."

The defendant in its answer admits the following facts to be true, viz :

(*a*) February 19, 1892, James R. Kelso, guardian of Arthur Robb et al., entered into a written contract with C. B. Shaffer and J. T. Keil, for a certain tract of land situate in South Fayette township, Allegheny county, Pennsylvania, containing seventy-six and one half acres, for oil and gas purposes. (*b*) This leasehold was on February 25, 1892, assigned and transferred to William J. Friday, J. T. Keil et al., composing the firm of Friday, Keil & Co. (*c*) On the same day, Friday, Keil & Co. entered into a contract with the plaintiffs, to drill, complete and put in satisfactory producing order, a well upon said leasehold; said well was completed and accepted in pursuance of said agreements, and the plaintiffs in consideration of the performance of the said contract on their part, had assigned to them an undivided one sixth interest in said leasehold. (*d*) Having thus become interested in said leasehold to the extent of a one sixth interest therein, after the completion of the first well, all expenses incurred in developing or operating said leasehold should be borne by them (plaintiffs and defendant) in proportion to their respective interests; that is, the defendant should bear five sixths interest of the same, and plaintiffs a one sixth interest of the same. (*e*) The plaintiffs should have the first opportunity of taking contracts for drilling wells on said leasehold premises, provided they would con-

tract to drill the same on as reasonable terms as other reliable contractors.

The master finds as a fact that plaintiffs under this contract drilled upon the leasehold premises in question wells known and designated as "Number One," "Number Two," "Number Three," "Number Four," "Number Five," "Number Six," and "Number Seven."

(*f*) That subsequently to February 25, 1892, Friday, Keil & Co. sold and transferred their interest in said leasehold premises to The Florence Oil Company, a corporation created under the laws of the commonwealth of Pennsylvania, and plaintiffs continued to drill wells upon said leasehold premises for said corporation under the agreement of February 25, 1892, made with Friday, Keil & Co.

Between the 4th and 15th days of July, 1892, plaintiffs commenced to drill well "Number Six," on said leasehold premises. Being located in the "McDonald Field," wells drilled in this field had to be drilled through the coal measure. In this case, as in the majority of the farms in this particular field, the coal measures had been sold by the owners of the farm, and had become vested in other parties, who were working the same. Owing to the fact that there was at this time a pending and undetermined conflict between the owners of the coal and the operators, as to the rights of the owners of the surface and the underlying strata below the coal and the oil operators as to their right to drill through the coal, the oil operators, in drilling their wells in this district, commenced the "spudding" of a well of a diameter of thirteen (13) inches, and drilled it this size to below the coal, so that a ten (10) inch casing could be put in the well to some point sufficiently far enough below the coal, so as to protect, in so far as they could, the coal workings from injury by leakings of oil into the same, or escape of gas into the mines, and jeopardizing the lives and limbs of the miners working therein, as well as the mine itself. After drilling through the coal, the diameter of the well was reduced to ten inches, and was drilled of this diameter to the depth of about seven hundred feet, or what is known by those engaged in drilling wells in this district as the "hurry up sand."

From the evidence it appears that between the point when the thirteen inch casing stopped and the bottom of the "hurry

up sand," there was neither cave nor water to any extent found, and therefore no necessity for putting in an eight and a quarter inch casing. From the bottom of the "hurry up sand," the diameter of the well was reduced to eight inches, and this well "Number Six" was drilled that diameter to the distance of one thousand two hundred and eighty feet from the surface. Having gone this distance it became necessary to put in the six and a quarter inch casing, for the purpose of casing off the water, etc. Having reached this point in drilling the well, and it being necessary to case the well, plaintiffs called upon defendant to furnish the necessary casing. This was early in August, 1892. Casing was placed by defendant near the well, and plaintiffs commenced lowering it into the well, and continued to do so until all the casing furnished by defendant had been used, when it was found that there was lacking from one hundred and seventy to two hundred feet of casing. Plaintiffs swung the casing already lowered, and whilst waiting for additional casing, that portion of the well became fastened, and being unable to either raise or lower it, the well had to be and was abandoned.

It is under this state of facts that the present contention arose.

The testimony bearing upon the furnishing of the casing is as follows :

[The master here quotes testimony covering eight pages of appellants' paper-book. As exceptions were taken to his findings of fact, only its extreme length excludes it.]

Under this testimony I am requested by plaintiffs to find a certain state of facts, and the defendant requests me to find a certain other state of facts. Before citing the different requests, I may state that the requests of the defendant appear to the mind of the master to raise a mixed question of law and fact. For this reason I shall determine the requests of the plaintiffs, as they more clearly raise questions of fact. In so far as my findings of fact are in favor of the plaintiffs, they naturally affect the requests of defendant in so far as those facts are concerned.

From the weight of the testimony offered and presented to me, I find the following facts, viz :

" 1. That defendant assumed the obligation to supply the

six and one quarter inch casing for well No. 6, and have it at the well in sufficient quantities when wanted." From the wording of the contract and the evidence, I find this request in favor of the plaintiffs.

"2. That the defendant failed to comply with this under-taking." The weight of the evidence shows that the defendant failed to furnish six and one quarter inch casing, after notice, in sufficient quantities to case off the salt water; and upon notice of such deficiency, some five or six hours thereafter, furnished some three hundred feet of new casing.

"3. That for the want of sufficient supply of said casing at the said well when needed, the said well was lost or destroyed, and an abandonment thereof became unavoidable; that, in consequence of such abandonment, the plaintiffs were compelled to pay, and did pay, the sum of $2,449.40." It is evident from the testimony that a sufficient supply of six and one quarter inch casing had not been supplied by the defendant to plaintiffs to permit them to case off the salt water draining into well No. 6. As the fact whether the well was lost or destroyed and an abandonment thereof became unavoidable, does not depend entirely upon this one act, but a question of contributory negligence (if I may so call it) on the part of the plaintiffs, arises from the fact that, when they found that a sufficient amount of casing had not been furnished by defendant, whether they were justified in permitting the one thousand one hundred feet of casing to swing in the well knowing the well to be in what is known as caving territory. In the judgment of the master, the defendant under its contract, knowing the depth at which oil was obtained in this (the McDonald) field, and the known sands through which the wells had to be drilled, and this being the sixth well drilled on this lease by plaintiffs for defendant, it was a duty incumbent upon defendant through its officers to furnish six and one quarter inch casing, after notice of the need of same, and in sufficient quantities to case off the salt water encountered. Plaintiffs having proceeded under the usual mode to string and lower the casing furnished them, when they found there was a deficiency in the number of feet of casing for the purpose of casing the well to the depth required, and having given notice to the farm boss of defendant of such deficiency, I find as a fact that plaintiffs' swinging the one thousand one

hundred feet of casing already lowered in this well upon the elevators, awaiting the arrival of additional casing, was not negligence on their part; the testimony shows the caving in this field to be in or near what is known as the salts, and by reason of plaintiffs being compelled to wait for this additional casing, said well No. 6 was lost or destroyed, and an abandonment thereof became unavoidable, but the loss or cost of the drilling of said well should not be charged wholly upon the plaintiffs. As to the amount of such loss, my finding in relation thereto is made in another part of my report.

" 4. That the weight of the evidence tends to show that the plaintiffs were not in fault because they allowed the said casing to remain in well No. 6 while waiting for more to finish it to the depth to which it had been bored." I find this request to be true. The evidence shows that plaintiffs, after discovering that a sufficient amount of casing had not been furnished, gave notice without delay to the farm boss of such deficiency, and then did that which, in their judgment as drillers of oil wells, was the best for the parties in interest; the bottom of the string of casing lowered by them into this well being above the caving place, no fault can be attributed to them for the sticking of the casing.

" 5. Prior to the boring of No. 6, the plaintiffs were requested by the duly authorized agents of the defendant not to use eight and a quarter inch casing when it could be dispensed with in the judgment of the plaintiffs." I find this request to be true. Dale Schafer, the defendant's farm boss, testifies that he made this request.

" 6. That in dispensing with the said eight and a quarter inch casing in said well No. 6, the plaintiffs exercised their judgment in good faith." I find as a fact, that the plaintiffs were not at fault in not using eight and a quarter inch casing, as from the testimony it appears such casing was not necessary in this well No. 6.

The defendant's requests being, in my judgment, mixed questions of law and fact, I give them here, but determine them in my conclusions of law.

" The bill alleges a contract of the plaintiffs to drill, complete and put in satisfactory producing order, a well; that this contract was performed; that in consideration thereof the plain-

tiffs received a one sixth interest in the leasehold; that they subsequently drilled upon the leasehold other wells which were accepted and paid for; that agreeably to their contract, they undertook to complete abandoned well No. 6, which was drilled to a depth of one thousand two hundred and eighty feet, but was destroyed, as plaintiffs allege, by reason of the default of the defendant."

And, in support thereof, alleges as follows:

" 1. As the loss of the well resulted from the casing becoming stuck, the defendant is not liable unless that accident was the natural and probable result of the delay in furnishing the casing, and one which might reasonably be supposed to have entered into the contemplation of the parties when the contract was made.

" 2. If the sticking of the casing and consequent loss of the well was a probable and natural consequence of the delay in furnishing the casing, and one which might reasonably be supposed to have entered into the contemplation of the parties when the contract was made, then the defendant is not liable, because such consequence, if natural and probable and foreseen, could have been prevented by the plaintiffs in pulling the casing pending the delay, beyond the place where the rock was liable to cave."

### CONCLUSIONS OF LAW.

The contract between the parties provided that plaintiffs should at their cost and expense erect a derrick, and drill, finish and complete a well in good producing order and condition, in manner as wells are usually completed in good producing condition in that vicinity. In case the well was a producing one, plaintiffs, at their cost and expense, were to furnish and set up tankage as might be needed for the successful operation of said well. If the well was a paying one, the derrick, engine, boiler, casing, tubing, tankage, and everything used in and about the operation of said well, was to belong to the parties to the contract as if part of the leasehold, when the interest in the leasehold was to be owned by the parties respectively in the following proportions: defendant five sixths interest therein, and plaintiffs one sixth interest therein.

The well when completed was a good producing one. The

plaintiffs having furnished all the machinery and material necessary to drill this well, the contract was then completed between the parties, and the consideration being the one named in the contract, plaintiffs were entitled to have the one sixth interest in said leasehold assigned and transferred to them. This was done, and they became tenants in common with the defendant in the leasehold in the proportions agreed upon.

Under this agreement, plaintiffs had the first opportunity of taking contracts for drilling other wells upon this leasehold " provided they contracted to drill the same on as reasonable terms as any other reliable contractor."

It is evident that as the first well was a venture, defendant did not care to take upon itself the cost and expense of said venture, but sought out some one who would take this risk. Plaintiffs assumed the risk. The venture was successful, and the contract was performed. The assignment of the one sixth interest in the leasehold to plaintiffs by defendant paid the consideration. After that had been done, there was nothing further to be done thereunder, excepting the privilege that plaintiffs might " have the first opportunity of taking contracts for drilling wells, provided they will contract on as reasonable terms as other reliable contractors."

Under the agreement to give the privilege of drilling the remaining wells on this leasehold, plaintiffs were to have the first opportunity to bid for the drilling of said wells under certain conditions, but the defendant most certainly reserved the right to refuse to accept such bid, or bids, or enter into a contract or contracts with the plaintiffs for this purpose, unless plaintiffs would contract to drill such wells on as reasonable terms as other reliable contractors might bid to do the same work for.

It is fair to assume, under this clause of the contract, that plaintiffs did make such bids for the additional wells (for they drilled in all seven wells upon the lease) and that such bids were on as reasonable terms as bids of other reliable contractors. Therefore, the drilling of each well stood upon the terms agreed upon at the time such letting was made by defendant, and the contract of February 25, 1892, has no bearing upon the drilling of any of the wells upon this leasehold, excepting the first well,

and in so far as the privilege granted plaintiffs to have the first opportunity to bid for the work.

The positions "first" and "second" of defendant in support of this position then relate to facts arising from the sticking of the casing in well No. 6. As my findings of the facts in reference thereto (as above set forth) are against the defendant, it would only be a duplication of that part of this report upon the same matter, consequently I dismiss these propositions.

The defendant claimed before the master in its argument as follows, viz : that the case was not properly within the jurisdiction of a court of equity, upon the ground that where the real and substantial controversy has relation to a question of an alleged breach of contract and a claim of unliquidated damages resulting therefrom, and when the case involves no real dispute beyond this, a court of equity has no jurisdiction.

There is no doubt, as a bald proposition of law, it is correct, and the plaintiff would be required to look to an action at law for his remedy, if the law furnished him with an adequate remedy therefor. It is true that equity, as a general rule, will not assume jurisdiction in every case where an accounting is demanded or needed; nor because the case involves or arises from fraud; nor because a contribution is sought from persons jointly indebted; nor even to recover money held in trust, when an action for money had and received will lie, as well as many other principles which might be cited. It is also true as a rule that the question of want of jurisdiction can be raised at any stage of the proceedings.

Let us look for a moment as to how this case appears upon the record and before the master :

July, 10, 1892, bill filed. July ——, 1892, bill served on defendant. July 14, 1892, defendant causes an appearance to be entered for it. September 29, 1893, defendant files an answer to said bill. October 30, 1893, general replication filed. December 2, 1893, master appointed. January 4, 1894, master met pursuant to notice. Parties, plaintiffs and defendant appear. Testimony covering three hundred and forty pages typewritten, taken. Arguments of counsel heard; no demurrer filed.

The question of jurisdiction not having been raised by defendant until the argument before the master, I feel that the principle laid down by the Supreme Court in the case of Fidelity

Company v. Wetzel, 152 Pa. 502, is safer to follow than to recommend the dismissal of the bill by reason of the turn taken; cost and expense, and merits of the case had been gone into by both parties. Justice MITCHELL, in delivering the opinion of the court in the above cited case, says : " The jurisdiction in equity as to affirmative relief in this case is, to say the least, questionable. The bill charges the receipt by defendant of certain specific sums of money, alleged to be the property of plaintiff's decedent, followed by the general and vague averment that other sums also came to the defendant's hands, etc., and then an averment of a demand for an account, and a refusal by the defendant on the ground he had no property of the decedent to account for. . . . As the bill however was not demurred to, and the case has been pursued to a final hearing, we do not deem it necessary to dispose of it now on that ground." In Adams' Appeal, 113 Pa. 449, Mr. Justice STERRETT, in delivering the opinion of the court, says : " While it is true that manifest want of jurisdiction in equity may be taken advantage of at any stage of the cause, the court will not permit an objection to its jurisdiction to prevail, in doubtful cases, after the parties have voluntarily proceeded to a hearing on the merits, but will administer suitable relief: Story's Eq. Jur. sec. 464. As was said in Sunbury & Erie R. R. Co v. Cooper, 33 Pa. 278, if the court in which suit is brought has jurisdiction of the cause of action, both at law and in equity, it may proceed to give relief, unless the bill be demurred to on the ground that the proper remedy is at law." In Drake v. Lacoe, 157 Pa. 17, the defendant submitted as a matter of law, that the bill was to recover a specific sum of money and could not be sustained. Upon this question the master said : " It is true that under the view taken by the master, the plaintiffs' bill is practically a bill to recover a specific sum of money for which the plaintiffs have their remedy at law. Had this objection been taken to the bill on demurrer before it was answered, it might have been sustained ; but the defendant having denied the material allegations of the plaintiffs' bill, and having had a full hearing on the merits, and heavy expense and cost having been incurred, it seems to the master too late to sustain this objection now." Exceptions (inter alia) were filed by the defendants to this ruling that he had erred in not dismissing the bill. The court sustained the exceptions and

dismissed plaintiffs' bill. Upon an appeal taken to the Supreme Court, that court overruled the court below, sustained the master, and entered a decree in favor of plaintiffs for the amount found to be due by the master.

A bill will not be dismissed for want of jurisdiction, after reference to a master, involving heavy costs: Edgett v. Douglass, 144 Pa. 95; Evans v. Goodwin, 132 Pa. 136; Adams' Appeal, supra; Adams v. Beach, 1 Phila. 99.

Will an account render lie between tenants in common in Pennsylvania? The statute of 4 Anne, chapter 16, section 27, provides that account render lies between tenants in common without any appointment as bailiff or receiver. 1 Am. & Eng. Ency. of Law, p. 130.

This statute was enacted by, and still is in force in, this commonwealth: Roberts' Digest of British Statutes; Norris v. Gould, 15 W. N. C. 187. The act of October 13, 1840, section 19, Purdon's Digest, ed. 1885, p. 692, expressly provides that courts shall have "the powers and jurisdiction of courts of chancery in settling . . . . such account and claims as by the common law and usages of this commonwealth have been settled by the action of account render," (and the plaintiff may) "proceed either by bill in chancery or at common law." "Under act October 13, 1840, courts of equity have concurrent jurisdiction with courts of law in all cases where an action of account render would lie:" Reeside v. Reeside, 49 Pa. 322; Frisbee's Appeal, 88 Pa. 146; Adams' Appeal, 113 Pa. 449; Norris v. Gould, supra. "And it may be said in general that in all cases where an action of account render would be the proper remedy, the jurisdiction of equity is undoubted:" Baker v. Biddle, Baldwin (U. S.), 394.

"While account render will not lie by one tenant in common against another for mere occupation of the property held in common, yet it does lie where one tenant in common receives the money or something else from another person to which both tenants are entitled:" Norris v. Gould, supra.

The reason is the tenant cannot be charged even by implication as bailiff or receiver when he has received nothing, which is the case when he merely occupies the common freehold. "In determining whether assumpsit or account render or a bill in equity is proper, the question is not, as it is sometimes sup-

posed, whether the jury can as conveniently settle the account as auditors, but it adheres to the right of the defendant to render his account before he can be molested by an action to refund. And where the duty is not direct, but one of outlay in business which, from its nature, requires an exhibit of the sums expended before the duty can arise, the legal requirement is to render an account, and assumpsit will not lie until the balance be ascertained. The right to render an account and settle exists in the very nature and equity of such a duty:" Reeside v. Reeside, supra.

Notwithstanding the right to raise the question of jurisdiction at any stage of the proceedings, and notwithstanding the view of the master that, if a demurrer had been filed by defendant it might have been sustained, defendant having availed itself of its right to file an answer, by which the parties were put to their proofs upon the merits of the case, entailing heavy expense and costs, and having proceeded to final argument of the case before the master, before raising this question, and believing that substantial justice can be done the parties upon the merits of the case, the master declines to recommend a dismissal of the bill upon this ground, believing that the authorities cited are ample in justifying this ruling.

Under the act of 4 Anne, chapter 15, and in force in this commonwealth, the provisions of the act of October 14, 1840, and the act of June 15, 1840, relating to the equity jurisdiction of the courts of this commonwealth, the master rules that a bill in equity of this character will lie for an account render.

In this case it is true that each party ran their own share of the oil to their own credit and sold the same. If each party had kept account of their share of the expenses of the operation upon the lease, then possibly there might have been some claim that no such accounting could be required. The defendant, however, undertook to keep the accounts pertaining to this leasehold, charging all expenses to it, and carried the same upon its books under the head of "Robb Lease Acct." It furnishes exhibits from its books showing this account, as well as statements showing expenses of "Robb Lease" from March 28, 1892, to November 1, 1892, also statements of credits to "Robb Lease" between June 29, 1892, and November 3, 1892, and Harrington Bros. in account with Florence Oil Co. The defendant made

all purchases connected with and pertaining to the lease, kept accounts of the same, paid the bills while the plaintiffs were at work in the field drilling the wells, and furnished plaintiffs statements from time to time deducting plaintiffs' proportion of said expenses from their drilling account. Under this state of facts, it appears to the mind of the master that this is a case where a bill for account render would prevail; and under the foregoing cited acts of assembly and authorities, as master, I conclude as a question of law, that equity has jurisdiction in this case to compel an accounting, and therefore, upon this ground also, overrule defendant's request to dismiss the bill for want of jurisdiction upon this point.

Independently of the act of October 13, 1840, supra, the equity powers conferred by the act of June 13, 1840, section 49, extend the equity jurisdiction of the courts of this commonwealth "to all cases over which courts of chancery entertain jurisdiction on the grounds of fraud, accident, mistake or account."

The bill in the seventh clause, charges "that the accounts between your orators (plaintiffs) and the defendant as tenants in common of the said leasehold, remain unsettled, and that the defendant claims compensation from your orators for their share of expense of caring for the wells on said leasehold, so as aforesaid drilled and completed (which your orators are willing to pay so far as the same is just and lawful), pray," etc. And the answer "that the share of the plaintiffs of the expense of operating the said leasehold was deducted from time to time, in settlements made for drilling done by them," tends strongly to show an agency, a fiduciary relation existing on the part of defendant to the plaintiffs; most certainly, with relation to the cost and expense of operating the leasehold, and for this reason I hold as a matter of law that plaintiffs are entitled to an accounting.

The master is of the opinion that the plaintiffs and defendant should bear the loss of well No. 6 in proportion to their interests in said leasehold; that is, plaintiffs should bear the one sixth part thereof, and defendant the five sixth part thereof.

The court dismissed exceptions to the master's report, and entered a decree that defendant pay the plaintiffs the sum of $2,456.03. Defendant appealed.

*Error assigned,* among others, was decree of the court.

*John F. Sanderson,* with him *Walter Lyon* and *Charles H. McKee,* for appellant.—The court had no jurisdiction : Searight v. Carlisle Deposit Bank, 162 Pa. 505; Silvis v. Clous, 1 Pa. Superior Ct. 41.

The undisputed facts are that the well was lost because the casing became fast in it; that the casing became fast because the rock caved in around it and fastened it; and that the defendant did nothing to cause the rock to cave. That proceeded from a natural cause, without its act or intervention. It was the proximate cause of the loss or injury, produced in a natural and continuous sequence, unbroken by any efficient intervening cause, and without which the result would not have happened : St. Louis etc. R. R. Co. v. Commercial Union Ins. Co., 139 U. S. 223; Morrison v. Davis & Co., 20 Pa. 171; R. R. v. Reeves, 10 Wall. 176 ; Hoadley v. Transportation Co., 115 Mass. 304; Dubuque Wood & Coal Association v. County of Dubuque, 30 Iowa, 176 ; Daniels v. Ballantine, 23 Ohio, 532; Billmeyer v. Wagner, 91 Pa. 92; Hadley v. Baxendale, 9 Exch. 341 ; Griffin v. Colver, 16 N. Y. 489.

The loss might have been prevented if it was or could have been foreseen : 1 Sedgwick on Damages, 164–5 ; Penna. R. R. v. Plank Road Co., 71 Pa. 350. Martin v. Railway Co., 5 Ark. 510, was similar to the case of St. Louis etc. R. R. Co. v. Commercial Union Ins. Co., 139 U. S. 223, and the ruling was based on the same reason. In James v. James, 58 Ark. 157, it appeared that certain cotton was burned at a gin after the ginner had broken his contract to gin the cotton by a certain time. He was held not to be liable.

*J. M. Stoner,* with him *F. R. Stoner,* for appellees.—Upon the question of jurisdiction the plaintiffs contend, that a party cannot involve his opponent in a long and costly hearing, in which several hundred pages of testimony are taken (in this cause three hundred and forty), and when the cause is being summed up before the master, and he finds himself worsted, spring an objection to the jurisdiction which, if tenable, might have been raised in limine : Adams's App., 113 Pa. 449 ; Evans v. Goodwin, 132 Pa. 136 ; Edgett v. Douglass, 144 Pa. 95 ;

Fidelity Co. v. Weitzel, 152 Pa. 502; Drake v. Lacoe, 157 Pa. 17; Searight v. Bank, 162 Pa. 504; Niles v. Williams, 24 Conn. 284; Ludlow v. Simond, 2 Caines Cases (N. Y.) 1; Nicholson v. Pim, 5 Ohio St. 31.

As the parties having these mutual dealings were tenants in common, the master determined that, under the statute of 4 Anne, ch. 16, sec. 27 (which is in force in Pennsylvania), account render would lie between them. This being the law, the act of October 13, 1840, sec. 19, P. L. 7 (Purd. Dig. 1885, p. 692), comes into play, and the plaintiffs may "proceed either by bill in chancery or the common law action of account render." And hence it has been repeatedly decided that courts of equity have concurrent jurisdiction with courts of law in all cases where account render would be an appropriate remedy: Reeside v. Reeside, 49 Pa. 322; Bierbower's App., 107 Pa. 14; Brush Electric Co.'s App., 114 Pa. 585; Kirkpatrick v. McDonald, 11 Pa. 387; Johnson v. Price, 172 Pa. 427.

Where two tenants in common are charged (as in this case) with the duty of paying for the development of the territory held in common, each one is primarily liable to contribute his share of the cost; and if either tenant denies liability, he must be in a position to put the responsibility for the entire expense upon his cotenant.

PER CURIAM, November 11, 1896:

For reasons given by the learned master, whose findings of fact and conclusions of law appear to have been approved by the court below, we are satisfied there is no error in this decree. The questions involved have been so satisfactorily disposed of that neither of them requires further discussion. Decree affirmed and appeal dismissed at appellant's costs.